**PATRICK J. BURKE**
Colorado State Bar No. 4943
Patrick J. Burke, P.C.
303 16th Street, Suite 200
Denver, CO 80202
(303) 825-3050
patrick-j-burke@msn.com

**ELLIS M. JOHNSTON III**
California State Bar No. 223664
CLARKE JOHNSTON THORP & RICE PC
180 Broadway, Suite 1800
San Diego, CA 92101
(619) 756-7632
trip@cjtrlaw.com

Attorneys for Mr. Earnest

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HONORABLE ANTHONY J. BATTAGLIA)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br>    vs.<br><br>JOHN TIMOTHY EARNEST,<br><br>              Defendant. | Case No.: 19CR1850-AJB<br><br>**DEFENDANT'S REPLY IN SUPPORT OF SENTENCING**<br><br>DATE: DECEMBER 28, 2021<br>TIME:  9:00 AM |

TO:   RANDY GROSSMAN, ACTING UNITED STATES ATTORNEY; PETER KO, ASSISTANT UNITED STATES ATTORNEY; AND CRYSTAL TIGNOR, UNITED STATES PROBATION OFFICER

**REPLY**

**A. It is relevant and significant that John Earnest has acknowledged that his own violent actions were not only legally wrong but morally wrong; this is an important step in the path of redemption taken by a person who will spend the rest of his natural life behind bars.**

The government acknowledges that probation should correct its report to reflect that Mr. Earnest condemned his own actions in this case. DE 133 at 1-2. But it

attempts to discount the significance of this important step for a young man radicalized by online forces and whose juvenile brain is still developing while in continuous custody. It also unfairly discounts this renunciation of violence by mischaracterizing the record.

The government begins by suggesting that Mr. Earnest's personal disavowal of his own violent acts are undercut by the fact that Mr. Earnest made these statements "about a week after mailing a letter to a podcast urging force and violence against Jews and certain 'non-Europeans.'" *Id.* at 1. Left out of the government's argument is the fact that Mr. Earnest told his caller on the same call that he expressed remorse for his actions and that the caller should tell this podcast to "not publish [his] letters because he needs to set the record straight" after coming to this profound realization. *See* DE 131, Ex. A.

The government further discounts the value of this significant development in Mr. Earnest's thinking and maturation when it claims that the call was made "two days after officials seized an unpublished manifesto from Earnest's cell in which he said violence against Jews is a 'mandatory' duty." DE 133 at 2. First, the government fails to explain that the writing was found in Mr. Earnest's previous cell in local custody after he had been transferred to the California Department of Corrections and Rehabilitation to serve out his life sentence in state custody. *See* Exhibit A (11/4/21 FBI 302 report 00020); *c.f.* PSR ¶ 131.[1] The government also fails to note that this "manifesto" was written long before Mr. Earnest's renunciation, a significant fact, considering that Mr. Earnest had been in local custody for over two and a half years

---

[1] The presentence report incorrectly states that the document was found at Donovan State Prison (where Mr. Earnest has never been housed) before his transfer to Wasco State Prison, but the point remains the same: there's no indication of how the writing temporally relates to his decision to disavow his own violence, despite the government's attempt to suggest that "two days" between the document's discovery and Mr. Earnest's renunciation somehow undercuts the sincerity of the latter.

before his expression of remorse. In sum, the government's timing arguments shouldn't and don't discount the significance of this development at all.

Nor is Mr. Earnest's disavowal of violence discounted by the fact that he supposedly said later that "his father and others at the church were 'the problem,' because they would not say his actions were wrong, but 'I was right about everything else.'" DE 133 at 2. To be clear, no one and nothing in the record has suggested that anyone thinks Mr. Earnest's actions in this case were anything but wrong. Even Mr. Earnest, himself, has said that his actions were wrong insofar as they involved violence. Assuming the government meant to say that Mr. Earnest was upset that others wouldn't agree that Jewish people were the "problem", this still would not undermine the important point that, whatever the "problem," Mr. Earnest has now realized that violence is not the answer.

Probation acknowledged today in an addendum that the government did not provide the probation officer with this discovery concerning Mr. Earnest's disavowal of his use of violence until December 7—two and a half weeks after probation filed its report. DE 136 at 1-2. And probation also notes that Mr. Earnest recently made an effort to publicly repent for his attack through the press. *Id.* at 2. But however Mr. Earnest may have privately or publicly attempted to express his disavowal of violence, it is important that this young man has come to this conclusion, one that is a significant marker on a path towards redemption.

**B. Designating a very young man to a life sentence in a state institution much closer to family might aid his rehabilitative process.**

The government speculates without any support that Mr. Earnest's request for a designation to state custody "is essentially an effort to evade monitoring and controls that could prevent him from disseminating more calls for violence against religions and races besides his own." DE 133 at 3-4. To begin, it is fanciful and incorrect to

suggest that the State of California doesn't have its own controls and measures to monitor and prevent calls of violence. *See, e.g.,* Cal. Code of Regulations § 3315(a)(3)(I) & (b) (classifying as a serious disciplinary offense any attempt by an inmate to willfully incite others to commit an act of force or violence and providing for segregation from general population as one of several disciplinary actions for such conduct); 2021 Cal. Dept. of Corrections and Rehab. Manual ("DOM") § 54010.8 (subjecting incoming and outgoing inmate mail to inspection); DOM § 54010.14 (specifically disallowing offense, threatening or other correspondence that contains security concerns); DOM § 52060.12 (subjecting inmate telephone calls to monitoring). Wherever Mr. Earnest is housed for the rest of his life, he will be subjected to adequate monitoring and repercussions for behavior that could incite or is intended to incite violence.

      What is not subject to speculation is the government's admitted efforts to (a) first, transfer Mr. Earnest into federal custody; and then, (b) have Mr. Earnest sent into isolation at the United States Penitentiary, Administrative Maximum, ("the Supermax") in Florence, Colorado, far from his family, and subject to the additional special administrative measures specifically referenced by the government in its pleading, measures that not only limit his interaction and visitation with others, but also his family and even counsel. *See* DE 133 at 3 (citing 28 C.F.R. § 501.3); *see also* Allard K. Lowenstein, *The Darkest Corner: Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons* (2017) (documenting the "extreme restrictions" arising from SAMS at ADX Florence).[2] The efforts, already underway, are not only troubling in light of Mr. Earnest's disavowal of violence, *see supra*, they are troubling because Mr. Earnest, in spite of the heinous nature of his crimes, committed them at such a young age.

---

[2] Found at https://ccrjustice.org/sites/default/files/attach/2017/09/SAMs%20Report.Final_.pdf.

Mr. Earnest will continue to pay for his crimes, no matter how young he was when he committed them. Rather than insisting on a trial (and any publicity that might have come from it), Mr. Earnest pled guilty and agreed to serve the rest of his natural life in prison.[3] And because of his age, that will be a very long time. But by ignoring Mr. Earnest's youth as a factor and inappropriately attempting to undercut his disavowal of violence in this case, the government is pursuing a course that cannot reasonably be justified; if the government achieves its apparent objective of placing Mr. Earnest under SAMS, Mr. Earnest will become isolated and frozen in the maturation process that he has clearly begun.

The United States Sentencing Commission has recognized the importance of youth in sentencing and punishment: "Recent studies on brain development and age, coupled with recent Supreme Court decisions recognizing differences in offender culpability due to age, have led some policymakers to reconsider how youthful offenders should be punished." U.S.S.G., *Youthful Offenders in the Federal System* (2017) (classifying "youthful offenders" as age 25 or younger).[4] Mr. Earnest committed these offenses when he was only 19 years old. He is still only 22 years old today.

Long ago, society chose the age of eighteen as the magical age where a person transitions from legal childhood to legal adulthood; however, science now tells us that there is nothing magic about a person's eighteenth birthday that makes him any more, or less, a child or an adult. For Mr. Earnest, that meant his brain was not operating in the manner of a fully-developed adult brain during the relevant time period. This is because the most important portion of the brain, the pre-frontal cortex, or PFC, was not

---

[3] Mr. Earnest made his initial offer to plead to life sentences, as to both the State and Federal charges, in October 2019.

[4] Found at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf

fully mature.  Research in developmental psychology and neuroscience in the years since the Supreme Court's ruling in *Roper v. Simmons*, 543 U.S. 551 (2005), has confirmed that older adolescents (ages 18-20 years old) differ from adults in ways that both diminish their culpability and impair their thinking, making them more impulsive, less comprehending of the consequences of their actions, and more susceptible to the influence of peers, even online peers. Such older adolescents (or "emerging adults") are less able to envision or comprehend the full range of potential future consequences of their immediate actions, and less able to control their impulses. The parts of the brain that enable impulse control and reasoned judgment are not yet fully developed in this age group. In a very real sense, until the early 20s, our youth do not yet fully know who they are or who they will ultimately become. Their vulnerability and still-developing nature preclude a reliable determination of who they will become or how they will grow and mature.

Before his rapid online radicalization, all indications pointed to Mr. Earnest being on course to lead a productive, meaningful and law-abiding life. Less than two years before this offense, John Earnest graduated from high school with very high grades and was "loved" by his teachers. PSR ¶ 252. He worked as a lifeguard, following in the path of his father, learning how to save and protect others. PSR ¶ 256. He volunteered free time to Feed San Diego and I Love a Clean San Diego. PSR ¶ 257. He built on this commitment to others with his decision to go to nursing school at CSU San Marcos. PSR ¶ 251.

But this path towards a good, productive life was unfortunately interrupted by a young, still-growing and immature mind, the mind of a youth who was still trying to identify who he was and left Mr. Earnest to being vulnerable to peer pressure and a fear of exclusion. *See* Robert Sapolsky, *Behave: The Biology of Humans at Our Best and Worst*, at 165 (documenting how neuroimaging studies demonstrate the sensitivity of young adults to their peers, leading them to identify who they are by how others

define them). The online world that John Earnest looked to for these self-identifying answers ultimately consumed him, leading to this tragic end.

John Earnest will spend the rest of his life, decade upon decade, in prison. And he will do so because of his actions, actions for which he has taken responsibility. But the nature of his custody should not be of a kind that precludes him from continuing a path of rehabilitation and being in proximity to those, such as his parents and family, who can ultimately help him continue the path of reconciliation and redemption that this young man has just only begun. But to follow the government's intended path at such an early juncture is sure to halt any such effort.

For these reasons, Mr. Earnest asks that the Court make the recommendation that Mr. Earnest serve his federal sentence in the custody of the California Department of Corrections and Rehabilitation, a recommendation that represents the best hope that Mr. Earnest will continue on a path that he has recently begun to come to terms with the damage that his actions have caused.

Dated: December 21, 2021

Respectfully submitted:

*s/ Patrick J. Burke*
**PATRICK J. BURKE**

*s/ Ellis M. Johnston III*
**ELLIS M. JOHNSTON III**

Attorneys for Mr. Earnest